# In the United States Court of Federal Claims

No. 21-1085
Filed: January 31, 2025[1]
Re-issued: February 27, 2025

|  |  |
|---|---|
| RAYMOND BAYTOS, *et al.*,  | ) |
| *Plaintiffs*, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant*. | ) |

## OPINION AND ORDER

**MEYERS, Judge**

    This is one of a series of cases brought by correctional officers seeking overtime pay for tasks they must complete prior to and after leaving their assigned posts at a federal prison. Generally, employees are only entitled to overtime compensation for preliminary or postliminary activities—those before and after the employee's primary job duties—unless those activities are indispensable to the performance of those primary job duties. But here the issue is not so much whether activities for which the Plaintiffs claim entitlement to overtime pay are indispensable to their primary job duties; the issue here is much more whether the Plaintiffs are, in fact, performing their primary job duties during this time—i.e. functioning as correctional officers. Because the Parties dispute all but the most basic facts, the court denies the Plaintiffs' motion for partial summary judgment and denies all but a small piece of the Government's cross-motion for partial summary judgment. The majority of the issues in this case must be resolved after trial.

    **I.**    **Background**

    The Plaintiffs are 146 current and former correctional officers ("COs") employed by the United States Bureau of Prisons ("BOP") at the Federal Correctional Institution ("FCI") and/or Federal Satellite Low Security ("FSL") Elkton in Lisbon, Ohio (collectively, "the Institution"). ECF No. 11 ¶¶ 1, 4. They filed this collective action alleging the Government has required them

---

[1] The court initially filed this Opinion and Order under seal to allow the Parties to propose redactions. Because the Parties informed the court that no redactions are necessary, the court re-issues this Opinion and Order in full.

to work more than 8 hours per day without overtime pay in violation of the Fair Labor Standards Act ("FLSA") of 1938, 29 U.S.C. §§ 201 *et seq*. ECF No. 11 ¶ 1. Specifically, the Plaintiffs allege that the Government failed to compensate them with the overtime the FLSA requires for certain pre-shift and post-shift activities performed beyond their regularly scheduled 8-hour days and 40-hour workweeks. *Id.* ¶ 7. They seek relief under the FLSA and under the Back Pay Act (BPA), 5 U.S.C. § 5596, for backpay, liquidated damages plus interest, and reasonable attorney's fees. *Id.* at 19.

The Institution is a low security prison facility that houses between 1,400 and 1,800 inmates at any given time. ECF No. 38-9 at 32:3–9. COs are assigned to work 8-hour shifts at correctional posts within the Institution, which is staffed 24-hours per day, 365 days per year. *Id.* at 28:6–9. The 24-hour posts[2] have three scheduled shifts: the Morning Watch, from 12 a.m. to 8 a.m.; the Day Watch, from 8 a.m. to 4 p.m.; and the Evening Watch, from 4 p.m. to 12 a.m. *Id.* at 81:1–12. The posts involved in this case are Compound #1, Compound #2, Control Center #1, the Housing Units, and the Special Housing Unit #1 (the "SHU"). ECF No. 38 at 5, ¶ 12.

COs have a series of steps to take before getting to their posts. Because they must be at their posts before their scheduled start time, they necessarily must arrive at the Institution before then. The Parties dispute what each step requires, how long they take, and whether they are compensable.

The basic facts about what COs do before getting to assigned posts are not generally in dispute. Upon entering the Institution, the COs must first pass through a security screening. ECF No. 43 at 5, ¶ 25. This involves passing through a magnetometer and placing all personal items on a conveyor for an x-ray search.

Once cleared, the COs generally don certain equipment they brought into the Institution with them that they claim they could not wear through the magnetometer. ECF No. 38 at 9, ¶ 36. Here there is some dispute as to whether the COs could wear their equipment through the magnetometer and whether the COs must don their equipment as soon as they clear or whether they can carry it with them to their assigned post. The parties also dispute whether the duty belts that the Plaintiffs pass through the x-ray machine constitute specialized equipment.

From here, the path a CO takes depends on where he or she is assigned to work for a given shift. COs assigned to the Control Center go straight there. ECF No. 38-10 at 130:9–16. COs working inside the secure compound of the Institution proceed through a sally port. ECF No. 43 at 34, 40. The sally port consists of a door that lets the COs into a corridor that has a door into the prison on the other end, and only one of these two doors may be open at a time. Inside the sally port is an accountability board on which they place an accountability chit—an identification tag—to let the command center know that they are inside the secure facility. ECF No. 38-10 at 123:10–20.

Once they clear the sally port, the COs proceed to walk to the Compound and pass through the "Kong Gate"—a large gate in a security wall/fence that separates the inmates inside

---

[2] There are posts at the Institution that are staffed for 8 or 16 hours per day, but those are not at issue in this litigation.

the Institution.  ECF No. 38 at 11, ¶ 44; ECF No. 43 at 41–43.  As discussed below, there is some dispute as to whether and how COs encounter inmates in this area between the sally port and the Kong Gate.  After passing through the Kong Gate, the COs are in the Compound with the inmates.  ECF No. 38 at 11, ¶ 45; ECF No. 43 at 46.

Next, COs walk to their assigned posts within the Compound.  ECF No. 38 at 11; ECF No. 43 at 43.  Recall that the assigned posts at issue from here are Compound #1, Compound #2, the Housing Units, and the SHU.  ECF No. 38 at 5, ¶ 12.  At the assigned posts, the oncoming COs relieve the officers that are going off-duty.  ECF No. 38-9 at 73:2–17.  The incoming and outgoing officers conduct an information exchange and an equipment exchange, although the parties dispute whether both are required.  *Id.*; ECF No. 43 at 12, ¶ 56.

The tasks are repeated at the end of a shift: The outgoing officer engages in an information and equipment exchange with the incoming officer, and walks to and passes through the Kong Gate and into the sally port.  In the sally port, the CO flips his or her accountability chit, informing the Command Center that the CO is no longer on the Compound.  ECF No. 38 at 16, ¶¶ 68–69; ECF No. 43 at 15, ¶ 69.  The CO then exits the sally port and the Institution.  *Id.*  The parties dispute several of the facts relevant to determining whether activities are compensable as well as how much time it takes to complete each step.  *See generally* ECF No. 43 at 3–15, ¶¶ 1–66.

The parties cross-move for partial summary judgment.

## II. Legal Standard

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law[,]" as opposed to "disputes that are irrelevant or unnecessary[.]"  *Id.*  Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* (emphasis in original).

As for the burden of proof, the moving party must demonstrate the absence of genuine issues of material fact.  RCFC 56(c)(1).  Here, both the Plaintiffs and the Government have moved for partial summary judgment, so each must separately establish that there are no genuine material issues in dispute and that they are entitled to judgment as a matter of law.  In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of the matter on summary judgment.  Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor.  See *AT & T Advertising, L.P. v. United States*, 147 Fed. Cl. 478, 482 (2020) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## III. Discussion

### A. Legal Framework

To resolve the cross-motions, the court must apply the FLSA, the Portal-to-Portal Act of 1947, and various Office of Personnel Management ("OPM") regulations. The court, therefore, begins with an overview of the legal framework applicable to this case.

    1.    <u>The FLSA and the Portal-to-Portal Act</u>

Congress enacted the FLSA to "guarantee[] compensation for all work or employment engaged in by" covered employees. *Tennessee Coal, Iron & R. Co. v. Muscoda, Loc. No. 123*, 321 U.S. 590, 602 (1944). When applicable, the FLSA prohibits an employer from allowing any covered employee to work beyond an 8-hour workday or 40-hour workweek, unless the employee receives overtime pay of at least one and one-half times his or her regular rate of pay for the overtime hours worked. 29 U.S.C. § 207(a)(1); 5 C.F.R. § 551.501(a). "Work" includes that which is "suffer[ed] or permit[ted] by the[] employer." 5 C.F.R. § 551.104. Employers who violate the FLSA are liable to covered employees for their unpaid overtime compensation, and an action may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

The FLSA does not define "work." In early cases, the Supreme Court broadly interpreted "work" to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business. *Tennessee Coal*, 321 U.S. at 598. Exertion is unnecessary for an activity to count as work under the FLSA because "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944). And the Supreme Court determined that the FLSA's "statutory workweek includes all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690–91 (1946).

These broad interpretations of the FLSA "provoked a flood of litigation." *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 31–32 (2014). Congress quickly responded with the Portal-to-Portal Act of 1947, 29 U.S.C. § 251 *et seq.*, which amended the FLSA. This statute limits an employer's liability for failing to pay overtime compensation by creating two exceptions from the definition of compensable work:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

A principal activity includes "all activities which are an 'integral and indispensable part of the principal activities.'" *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29-30 (2005) (quoting *Steiner v.*

*Mitchell*, 350 U.S. 247, 252-53 (1956)). An activity is "integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Solutions*, 574 U.S. at 33. The inquiry does not turn on whether the activity is required by the employer or done solely for the employer's benefit; instead, the inquiry is dependent upon whether the activity is "tied to the productive work that the employee is employed to perform." *Id.* at 36.

To recap: Work activities are compensable only if they are the principal activities that an employee is employed to perform, or if they are integral and indispensable to those principal activities. Liability, therefore, turns on two questions. First, what are the employee's principal activities? Second, are the claimed activities "integral and indispensable" parts of the principal activities? *Adegbite v. United States*, 156 Fed. Cl. 495, 505 (2021).

2. The De Minimis Doctrine

An otherwise compensable activity under the FLSA, as amended by the Portal-to-Portal Act, may nonetheless be non-compensable under the de minimis doctrine. *See Mt. Clemens Pottery Co.*, 328 U.S. at 692. The doctrine "limits FLSA liability for overtime activities that consume negligible amounts of time." *Bull v. United States*, 68 Fed. Cl. 212, 225, *clarified by* 68 Fed. Cl. 276 (2005), *aff'd*, 479 F.3d 1365 (Fed. Cir. 2007). As the Supreme Court explained:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Mt. Clemens Pottery Co.*, 328 U.S. at 692.

Federal regulations limit "the application of the de minimis doctrine to periods of 10 minutes or less per day." *Bull*, 68 Fed. Cl. at 226 (citing 5 C.F.R. § 551.412(a)(1)); *see also Riggs v. United States*, 21 Cl. Ct. 664 (1990). And sometimes, periods longer than 10 minutes can be de minimis. In those cases, courts consider: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work. *See Carlsen v. United States*, 521 F.3d 1371, 1380-81 (Fed. Cir. 2008) (citing *Lindow v. United*, 738 F.2d 1057 (9th Cir. 1984)).

The Plaintiffs believe that the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) commands the court "afford no deference to" OPM's regulation concerning the de minimis rule. ECF No. 57 at 1. Not so. *Loper Bright* overturned *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* instructed courts to defer to an agency's reasonable interpretation of a statute it administers. *Chevron U.S.A. Inc.*, 467 U.S. at 843. In "leav[ing] *Chevron* behind," *Loper Bright*, 144 S. Ct. at 2273, the Court told lower courts to "exercise their independent judgment in

deciding whether an agency has acted within its statutory authority, and courts may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* But *Loper Bright* did not instruct courts to set aside prior decisions that relied on the *Chevron* framework. It explicitly did the opposite: "[W]e do not call into question prior cases that relied on the *Chevron* framework." *Loper Bright*, 144 S. Ct. at 2273. In other words, this court is still bound by the Federal Circuit's decisions that relied on *Chevron* to reach their conclusions. Therefore, the court must adhere to *Carlsen's* framework that any overtime that takes under 10 minutes per day is de minimis and apply the *Lindow* factors to any overtime that takes more than 10 minutes per day.

### B. The continuous workday doctrine is not applicable to the Plaintiffs.

One other doctrine needs addressing before turning fully to the merits. The Plaintiffs argue that the continuous workday doctrine applies to their claims. *See* ECF No. 38 at 2, 20, 22, 23, 27-28, 32. Under the doctrine, employees "must be paid from the moment they begin performing their principal activity or integral and indispensable activity . . . until they finish performing their last principal or integral and indispensable activity of the day." *Aitken v. United States ("Aitken II")*, 172 Fed. Cl. 377, 407 (2024) (citing *Bridges v. United States*, 54 F.4th 703 (Fed. Cir. 2022)). Thus, the doctrine applies even if the time in between includes activities that would not otherwise be compensable.

Their argument fails because the "continuous workday rule does not apply to federal employees in the same way that it applies to" employees from the private sector. *Alkire v. United States*, 158 Fed. Cl. 380, 396 (2022). The court recognizes that it denied the Government's motion to dismiss based in part on the application of the continuous workday rule. That is not dispositive here because the Government did not argue at the motion to dismiss stage that the rule does not apply. Instead, the Government argued that de minimis activities would not trigger the start of the continuous workday. *See, e.g.*, ECF No. 16 at 29-30. Now the Government argues that, as a matter of law, the continuous workday rule does not apply.

The resolution of this question is straightforward. The continuous workday rule appears in Department of Labor ("DOL") regulations. 29 C.F.R. § 790.6. That is not subject to dispute. Nor is it debatable that OPM regulations govern federal employees, while DOL regulations govern private employees. Specifically, OPM administers the FLSA "with respect to any person employed by an agency," subject to exceptions inapplicable to BOP employees. 5 C.F.R. § 551.102. Because the Plaintiffs are employees of the BOP, which is an agency of the federal government, the court must apply OPM regulations rather than DOL regulations.

And under OPM regulations, the court must "exclude time spent performing hours of work 'even if it occurs between periods of activity that are compensable as hours of work.'" 5 C.F.R. § 551.412(b). In other words, Section 551.412(b) provides that the continuous workday rule does not apply to agency employees. In short, agency employees get paid for their compensable time and any non-compensable time between compensable time is not compensated. *Aitken II*, 172 Fed. Cl. at 408. Therefore, the Plaintiffs' arguments regarding compensability based on the continuous workday doctrine fail as a matter of law and will only be briefly addressed in the subsequent sections.

C.     **Factual disputes abound.**

The central question here is which activities a CO must perform prior to arrivinsg at and after leaving an assigned post are compensable. The parties dispute many facts regarding what the CO's must do and how long each activity takes. The court considers each in turn.

1.     Clearing the staff security screenings.

Upon entering the Institution, COs must clear a security screening in the front lobby. ECF No. 38 at 7, ¶ 24; ECF No. 43 at 5, ¶ 25. They place the items they brought to work on the x-ray conveyor belt and walk through a metal detector. ECF No. 38-9 at 86:8–17. The purpose of the screening is to prevent contraband from entering the prison, but it was not until 2008 that the Institution implemented the screening requirement. *Id.* at 85:12–14; ECF No. 43-1 at A41, ¶¶ 20-21.

The Plaintiffs believe that clearing the security screening is either a principal activity or "indispensable and intrinsic" to their "principal job duty of searching for contraband and ensuring safety and security of the Institution." ECF No. 38 at 25. Ensuring that "they are not bringing any contraband into the Institution . . . is tied to the productive work that [they] are employed to perform." *Id.* at 21. Furthermore, they argue, COs "are expected to maintain vigilance in the front lobby" because they sometimes encounter inmates there. *Id.* at 8, ¶ 30. The Government disagrees. It argues that the screenings are not compensable because it is not the type of work for which the Plaintiffs are employed. ECF No. 43 at 28. The Government adds that security screenings are dispensable, not intrinsic to corrections work, and that the act of searching for contraband is different than the passive act of being searched. *Id.* at 26–29.

The time spent passing through the security screening is neither a principal activity nor "integral or indispensable" to a principal activity. *Integrity Staffing Solutions*, 574 U.S. at 27; *Aitken v. United States ("Aitken I")*, 162 Fed. Cl. 356 (2022). *Integrity Staffing* involved post-shift theft screening for warehouse workers who retrieved products from shelves and packaged them for Amazon delivery. *Integrity Staffing Solutions*, 574 U.S. at 28. The screenings were not the principal activities the employees were employed to perform—their jobs involved retrieving products from warehouse shelves and preparing them for shipment. *Id.* at 35. The Supreme Court concluded that the screening, although required by the employer, was not compensable because it was done to prevent theft, not for anything that was necessary for the employees to perform their jobs safely and efficiently. *Id.*

In the same context the court faces here, *Aitken* addressed the question of whether prison guards' passing through security screening is compensable. In *Aitken*, prison guards at another federal prison sought overtime for pre-shift screening, among other activities. *Aitken I*, 162 Fed. Cl. at 365. Judge Schwartz held that the security screenings were not compensable because they were not the employees' principal activities. *Id.* Their primary job duty—"to maintain the safety and security of the inmates, staff, and Prison"—was accomplished in part by inspecting and confiscating contraband. *Id.* But there was no evidence that the plaintiffs were "employed to undergo security screenings" or that "there [was] anything 'productive' about the security screenings." *Id.*

So too here.  The Plaintiffs' principal activity, according to them, "is to ensure the safety and security of the Institution, the inmates, and the staff."  ECF No. 38 at 2.  This encompasses specific tasks, like inspecting for contraband and correcting inmate behavior.  These specific tasks are the "principal activities that the employees were employed to perform," much like the workers in *Integrity Staffing* were employed "to retrieve products from warehouse shelves and package" them for shipment.  *See Integrity Staffing Solutions*, 574 U.S. at 35.  The COs were not employed to undergo security screenings, and no evidence has been presented that there is anything "productive" about the security screenings.  Therefore, the security screenings are not the principal activities of the Plaintiffs.

Nor are the screenings integral or indispensable to a principal activity.  The screenings at issue in *Integrity Staffing* failed the test because they "were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment."  *Id.*  The Supreme Court there found persuasive a DOL letter that concluded that "a preshift security search of employees in a rocket-powder plant 'for matches, spark producing devices such as cigarette lighters, and other items which have a direct bearing on the safety of the employees'" was not integral and indispensable to the employees' work.  *Id.* (citing the DOL letter).  In *Aitken*, Judge Schwartz agreed and concluded that screenings were not integral or indispensable:

> If a pre-shift search for prohibited fire-starters at an explosive
> factory is not integral or indispensable to those employees'
> principal activities, it is hard to imagine why a search for
> contraband at a prison would be.  Just as a theft screening is not an
> intrinsic element of retrieving products from warehouse shelves of
> packaging them for shipment, Plaintiffs point to nothing in the
> record suggesting that they must spend time in screening in order
> to remove contraband from the Prison, screen others for
> contraband, and refrain from bringing contraband in.

*Aitken I*, 162 Fed. Cl. at 365.

In the end, the security screening is not integral and indispensable to the CO's principal activity.  It is not integral to a principal activity because the security screening is not an intrinsic element of maintaining safety inside the Institution.  Being screened to ensure compliance with the Institution's contraband rules is not an intrinsic part of the Plaintiffs' job.

The Plaintiffs rely on *Aguilar v. Management & Training Corp.*, which did hold security screenings to be compensable, to support their argument.  948 F.3d 1270 (10th Cir. 2020).  There, a similar pre-shift security screening was found to be part of the employees' principal activities because "the security screening and the officers' work share the same purpose" and because the screening was "tied to" the employees' work.  *Id.* at 1278.  But that result misreads *Integrity Staffing*.  Screenings are not principal activities just because they are "in some way related to the work that the employees performed."  *Aitken I*, 162 Fed. Cl. at 365 (quoting *Integrity Staffing Solutions*, 574 U.S. at 38 (Sotomayor, J., concurring)).  If that were so, "virtually every pre- and post-shift activity required by an employee would be compensable."  *Aitken I*, 162 Fed. Cl. at 367.  Such an approach was explicitly rejected by the Supreme Court: "If the test could be satisfied by the fact that an employer required by an activity, it would sweep

into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address." *Integrity Staffing Solutions*, 574 U.S. at 36. And an activity is integral or indispensable when it is "tied to the productive work that the employee is employed to perform," not to the general, broad purposes of employment. *Id.*

As a matter of law, security screenings are neither principal activities nor integral or indispensable to principal activities. Therefore, they are not compensable. Therefore, the court grants the Government's cross-motion insofar as it seeks summary judgment that the security screenings are not compensable.

2. <u>Donning and doffing of duty belts and equipment.</u>

After passing through the security screening, COs pick up any equipment they placed on the x-ray conveyor belt. ECF No. 38-9 at 86:11–17. This is about as far as the parties go in their agreement as to the facts of what COs do after passing through the screening.

On the Plaintiffs' account, COs must arrive at work with their duty belts, metal clips, metal accountability chits, and chains. ECF No. 38 at 9, ¶¶ 33-36. The metal clips and chains hook onto the duty belts and are eventually used to secure the equipment the COs receive during the later equipment exchange. *Id.*, ¶ 35. The later exchange is where the COs receive equipment assigned to the post. ECF No. 43 at 7, ¶ 32; ECF No. 43-1 at A43. The accountability chits are identifiers for supervisors and the rest of the Institution's staff. ECF No. 38-9 at 63–65.

Plaintiffs argue that donning the duty belt and related equipment is compensable for two reasons. First, the duty belt and related equipment are "specialized." ECF No. 38 at 25. Because they are specialized and serve "security-related functions," donning them is "indispensable and intrinsic" to their principal activities. *Id.* If the equipment is specialized, then the time donning it is compensable. *Steiner*, 350 U.S. at 250–53 (finding compensable the time employees of a battery plant spent donning protective gear to protect them from chemicals). They also say they are to don the equipment in the front lobby after the screening. ECF No. 38 at 9, ¶ 32–34. It is not disputed that the BOP trains them to do this. ECF No. 38-9 at 70:13–17.

The Government disagrees with a few key points that underlie the Plaintiffs' arguments, rendering this claim unfit for resolution at summary judgment. According to the Government, there is nothing that requires the COs to don their belts in the front lobby. ECF No. 43 at 8, ¶ 32. That is, the Government does not dispute that COs must don their belts for their work at their duty station, they believe that the COs may carry their belts all the way through the Institution and don them at their assigned post. *Id.* at 36–37. That said, the Government does not dispute that it trains the COs to don their duty belts in the front lobby. ECF No. 38-9 at 70:13–17. While it would appear to defy common sense for a CO to walk through a prison carrying their duty belts rather than wearing them, the court cannot resolve this on summary judgment.

The Government also disagrees with the Plaintiffs' assertion that COs must arrive at work with their duty belts. ECF No. 43 at 8, ¶ 32. According to the Government, the COs may "wear anything that attaches to the body and can hold the equipment they pick up during the exchange with the outgoing officer." *Id.* It is, however, entirely unclear what this might be if not a belt, and the Government does not specify. The Government also disagrees with Plaintiffs

that certain parts of the duty belt and certain attachments must be metal; according to the Government they can be plastic. *Id.* Thus, according to the Government, the COs are free to wear belts (or some other thing that attaches to the body any carries stuff) with plastic components that would not set off the metal detectors and the COs' choices to utilize metal equipment does not make the donning of the belts compensable. The Government also disputes that the belt and the attached clips and chits and chains are specialized equipment. *Id.* at 33. Of course, if the equipment is not specialized (like the protective clothing in *Steiner*), then donning it is not compensable. And the parties dispute how long this all takes. ECF No. 43 at 9, ¶ 37.

At the outset, the argument regarding the continuous workday rule fails for the reasons discussed above. *See supra* Section IV.B. Thus, the dispute about *where* the COs don their belt is immaterial. What is material is the nature of the items the Plaintiffs don and the amount of time it takes. The disagreement about whether the duty belt and the related equipment is specialized cannot be resolved at this stage.

Here, the Parties dispute the necessary structure of the belt and the characteristics of its attachments, among other points. These disputes go to the core of whether the equipment is specialized, meaning it is material. And it is genuine because the evidence could lead a reasonable jury to decide either way. Furthermore, because it is unclear how long donning takes, the court cannot determine whether this (when coupled with the other activities that may be compensable in a given day) is de minimis. The Plaintiffs say that clearing the security screening and putting on the equipment takes 3 minutes, on average. ECF No. 38 at 10, ¶ 37. But clearing the security screening is not compensable, *see supra* Section IV.C.1, and the court is left without clear evidence on this point.

If at this point a reader is wondering how the court could grant summary judgment given all these disputed facts, you are not alone. Nor will your wonderment cease any time soon—this is just the beginning.

### 3. Clearing the sally port and Kong Gate.

After clearing the security screening and collecting their items, COs generally proceed toward the sally port because all the duty posts at issue other than the Control Center require passing through the sally port. Again, the sally port is a corridor that serves as the primary entry and exit point for the secure portion of the Institution—i.e., the portion of the Institution housing the inmates. ECF No. 38-9 at 15:2–19. Each door is controlled by the Control Center officer, and only one can be opened at a time. *Id.* While in the sally port, COs flip their accountability chit on a large board. ECF No. 38-10 at 93:3–20. This indicates whether they are physically in the secure portion of the Institution. *Id.* at 93:18–21. COs then proceed along an outdoor walkway toward the "Kong Gate." *Id.* at 131:17–20. The Kong Gate, which apparently got its name because of its large size, is a locked security gate surrounding the secure compound that the Control Center must open and close. *Id.* at 145:5–19.

The parties dispute what COs must do while walking from the sally port to and through the Kong Gate. At oral argument, the Plaintiffs explained that once they "are within the secured confines of the Institution," they are with inmates, "maintaining constant vigilance." ECF No. 63 at 30–31. The Government responded that any interaction between COs and prisoners in this

spot is quite rare. *Id.* at 74. But there is nothing in the record indicating how often COs encounter prisoners in this area and what the COs are required to do. It appears that COs would be responsible for maintaining discipline like they do at their assigned post. This dispute will thus need to be resolved at trial.

It is also unclear how much time it takes to get from the sally port to the Kong Gate. For the time calculation, the Plaintiffs say it takes between 1 minute and 1 minute and 30 seconds to walk from the sally port to the Kong Gate. ECF No. 38 at 11, ¶ 44. The Government does not point to other evidence addressing how long it takes. Again, the court will need to address this after trial.

### 4. Walking from the Kong Gate to assigned posts.

After clearing the Kong Gate, COs are on the Compound with the inmates. ECF No. 38-10 at 68–69. While walking to their posts, the record shows that COs encounter inmates and interact with them, like by verbally correcting behavior or ensuring they follow uniform rules or enforcing other rules of the Institution. *Id.* In this respect, there is really no difference between the COs' obligations to correct inmate conduct while walking to their post and the work they do at their posts. In other words, it appears that COs are, in fact, performing their primary job function while walking through the Compound. ECF No. 38 at 2 (stating that the COs' principal activity "is to ensure the safety and security of the Institution, the inmates, and the staff").

But the record also indicates that the COs do not interact that much with inmates on the walk to the posts, in part because the Institution schedules the controlled movement of inmates at times that are not close to shift changes. ECF No. 43-1 at A44, ¶ 23. Furthermore, the Government points to evidence that "a correctional officer will normally just continue walking while they call out to the inmate with instructions to comply" and if it takes longer than just a moment, overtime should be requested, and it will likely be granted. ECF No. 43 at 46. In the end, it remains disputed how often COs must correct prisoner behavior while walking to their assigned posts and whether these prisoners are directly supervised. It may be that COs are effectively performing their principal activities during this walk and it is compensable time. *E.g., Aitken II*, 172 Fed. Cl. at 410–11.

To be sure, the Portal-to-Portal Act specifically provides that "no employer shall be subject to any liability or punishment under the Fair Labor Standards Act . . . on account of the failure of such employer to pay an employee" for "walking . . . to and from the actual place of performance of the principal activity or activities which the employee is employed to perform . . . ." 29 U.S.C. § 254(a)(1). But while walking to their post, COs often perform their principal activity; they are not just walking to the place of performance of such activity. It is often "more than a simple act of traveling to a place of work." *Aitken II*, 172 Fed. CL. at 410.

And true to form, the Parties dispute how long it takes to walk to each post, so the total time that Plaintiffs spend walking to their posts remains to be determined at trial as well.

#### a) Compound #1 and Compound #2

Compound #1 and Compound #2 officers are responsible for the grounds of the Institution and for running the controlled movement of inmates. ECF No. 38 at 5, ¶ 13. The

Plaintiffs say the walk from the Kong Gate to these posts takes anywhere from 1 minute to 5 minutes. *Id.* at 13, ¶ 55. The Government disputes how long it takes, arguing that it would take "ten seconds" to walk to "where the Compound exchanges can take place." ECF No. 43 at 51. The Parties both point to evidence that supports their conclusions. Thus, the court cannot resolve this issue on summary judgment.

### b) Control Center #1

The Control Center #1 officer works in the Control Center. ECF No. 38 at 5, ¶ 14. The Control Center is where the screening sites and sally port are. *Id.* at 5, ¶ 14; ECF No. 43 at 43. It is also where the sally port doors are controlled, about 20–50 feet from the screening site. ECF No. 43 at 43. The Plaintiffs did not provide a time estimate. The Government estimates about ten seconds. *Id.* at 51.

### c) Housing Unit

Housing unit officers conduct security checks in the housing unit and are responsible for the day-to-day activities. ECF No. 38 at 5, ¶ 15. The Plaintiffs say that it takes between 3 and 5 minutes to walk to a Housing Unit. *Id.* at 13, ¶ 51. The Government disputes that number, explaining that the deposition testimony varies, which is necessarily the case because the housing units are at different places within the Institution. ECF No. 43 at 11, ¶ 51. Given the differences, the Government says it would take between 1 minute and 5 seconds and 3 minutes and 14 seconds, based off the average walk speed used by arbitrators. *Id.* at 51.

### d) Special Housing Unit

SHU officers perform various tasks regarding the inmates in the unit. ECF No. 38 at 5–6, ¶ 16. The Plaintiffs say it takes between 2 and 3 minutes to walk to the SHU, *id.* at 13, ¶ 52, but the Government disagrees, pointing to conflicting evidence, ECF No. 43 at 11, ¶ 53. The Government says that it would likely take 1 minute and 52 seconds based off of the typical walk speed used in arbitrations. *Id.* at 51.

Given the extensive conflicting evidence, fact questions remain about the time it takes to walk to each post. The contradictory evidence is material, because it goes to whether COs, in the aggregate, spend more than de minimis time on potentially compensable activities. It cannot be decided at this stage.

### 5. Exchange of information and equipment at shift change.

The final step before a CO's shift begins is to perform an exchange with the outgoing officer. ECF No. 38-9 at 54:1–9. The Plaintiffs say that the exchange includes information and equipment. ECF No. 38 at 13-14, ¶ 56. The Government says only an equipment exchange needs to happen. ECF No. 43 at 51.

According to the Plaintiffs, the COs are instructed to log anything of note from their shift into an online tracking system called TruScope, or into an analog logbook. ECF No. 43-1 at A44, ¶ 24. The Plaintiffs say that the information exchange is where the outgoing CO explains any security and safety issues observed during the shift, the rationale being that it is "the best and

most comprehensive way to obtain critical security information." ECF No. 38 at 31. It is "necessary to ensure the safety and security of the Institution" because TruScope and the logbooks might not catch everything. *Id.* at 14, ¶ 60. The Government points to a post order "instructing [COs] to record all pertinent information that occurred during their shift intro TruScope or the logbook[.]" ECF No. 43 at 13, ¶ 60. Because COs are instructed to check each, the Government argues, any verbal exchange is unnecessary. *Id.* at 52.

The record indicates that an information exchange may well be important because not all pertinent information is always available from TruScope or the logbook. ECF No. 38-9 at 83:14–19; ECF No. 38-10 at 9:19–22. On the other hand, COs are not instructed to conduct an information exchange. ECF No. 43-1 at 524. This is a genuine dispute of material fact. And even if the information exchange ultimately integral and indispensable, or is part of the COs' principal activities, there is an additional time dispute.

For the equipment exchange, the Government concedes that it is integral and indispensable. ECF No. 43 at 53. But it disagrees about what the equipment exchange entails. The Plaintiffs say that it includes a joint inventory and inspection of equipment. ECF No. 38 at 15, ¶ 61. The Government says that only the incoming officer needs to conduct the inventory, relying on post orders. Unsurprisingly, there is also a time disagreement. ECF No. 43 at 53. The Government points to a video indicating roughly 2 minutes and 30 seconds for the longest of the exchanges, *id.* at 56, while the Plaintiffs point to testimony suggesting it takes longer. ECF No. 38 at 15, ¶¶ 62-65. The Plaintiffs say that the exchange at the Control Center takes, on average, 8 to 10 minutes, *id.* at 15, ¶ 62; at a Housing Unit, 6 minutes, *id.* at 15, ¶ 63; at the SHU, 7 minutes, *id.* at 15, ¶ 64; and at the Compound, 5 minutes, *id.* at 15, ¶ 65. Averaged out, the Plaintiffs say the exchange take 5 minutes. ECF No. 48 at 36. Again, the Defendant says the longest it should take is 2 minutes and 30 seconds. ECF No. 43 at 56. The court cannot decide these disputes at summary judgment. This will be decided at trial.

### D.     It is not clear when the workday of the prison guard ends.

#### 1.     Exiting the Institution.

COs are only allowed to leave their shift after they have been "properly relieved" by another CO. ECF No. 38-9 at 54:1–9. After the end of a shift, COs engage "in the same tasks they perform before the start of their shifts but in reverse order." ECF No. 38 at 16, ¶ 69. This includes a verbal information and equipment exchange with the oncoming officer, a walk across the Compound and through the Kong Gate and sally port, where COs flip their accountability chit, and then exit the Institution. *Id.* Again, the Parties dispute whether the verbal information exchange and other portions of the equipment exchange are necessary. ECF No. 43 at 12, ¶ 56. The Government characterizes the exit process as the CO being free to simply walk out of the Institution. *Id.* at 57. Plaintiffs, however, contend that they are required to perform their primary function as prison guards as they exit the prison just as they did on the way in. ECF No. 38 at 16, ¶ 69.

The Plaintiffs say it takes 6 minutes, on average, to walk from the posts to the exit through the Control Center sally port. *Id.* at 36. The Government, based off the previously

provided information, says the longest it should take is 3 minutes, 14 seconds. ECF No. 43 at 60.

This will be decided at trial.

### E. Statute of Limitations

The Parties also dispute the applicable statute of limitations. The Plaintiffs say three years, ECF No. 38 at 39, while the Defendant says two. ECF No. 43 at 65. FLSA actions usually come with a two-year statute of limitations. 29 U.S.C. § 255(a). A three-year statute of limitations, however, applies if the employer's violations were willful. *Id*. A violation is willful when "the agency knew that its conduct was prohibited . . . or showed reckless disregard of the requirements of the Act." 5 C.F.R. § 551.104. And "reckless disregard" means "failure to make adequate inquiry into whether conduct is in compliance with the Act." *Id.* Answering this question at this stage is not possible, because of the many factual disputes that necessarily underlie the arguments and are explained above. It will be decided at trial.

### F. Liquidated Damages

The Parties also dispute whether liquidated damages are available. *Compare* ECF No. 38 at 1, *with* ECF No. 43 at 3. Liquidated damages provide "compensation for the retention of a workman's pay" caused by an employer violating the FLSA. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). Liquidated damages can be mitigated if the employer demonstrates good faith and reasonable grounds for believing that it was not in violation of the FLSA. 29 U.S.C. § 60. The availability of liquidated damages turns on whether the employer in fact violated the FLSA, a question the court cannot decide at this stage. Again, this will be decided at trial.

### IV. Conclusion

For the foregoing reasons, the court denies the Plaintiffs' motion for partial summary judgment, ECF No. 37, and grants-in-part and denies-in-part the Government's cross-motion for partial summary judgment, ECF No. 43. The court also grants Plaintiffs' motion for leave to file supplemental authority, ECF No. 57.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge